JAMES C. GEORGACOPOULOS *vs.* WILLIAM KATRALIS.

Middlesex. February 6, 1945. — March 5, 1945.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & SPALDING, JJ.

*Husband and Wife. Unlawful Interference. Actionable Tort.*

To maintain an action of tort for enticing away the plaintiff's wife and for loss of consortium it was not necessary to allege and prove infidelity on the part of the wife in which the defendant was a participant; evidence, warranting the jury in finding that the defendant was a rival for the affections of the plaintiff's wife and by his conduct had improperly induced her to leave the plaintiff and to deprive the plaintiff of her consortium, was sufficient.

TORT. Writ in the Superior Court dated March 22, 1943. The case was tried before *Morton, J.*

*R. B. Bowmar,* for the defendant, submitted a brief.

*G. N. Moushegian,* for the plaintiff.

DOLAN, J. This is an action of tort for wrongfully enticing away the plaintiff's wife and for loss of consortium.

At the conclusion of the evidence the judge denied the defendant's motion for a directed verdict in his favor. The defendant duly excepted. The jury returned a verdict for the plaintiff.

The evidence would have warranted the jury in finding the following facts. The plaintiff married Stavroula Mariolis on January 4, 1939. They lived together happily until about December 15, 1942. At that time the attitude of his wife toward the plaintiff changed. She became cold toward him. He found at that time a telegram in her pocketbook which read as follows: "Please call at once 2174. Bill" (the defendant). The plaintiff discovered that she was making curtains for the defendant and chided her for so doing. On December 31, the plaintiff and his wife were invited by the defendant to visit him at Ayer for a New Year's eve party. They accepted. The plaintiff retired early, his wife remaining downstairs in the defendant's spa. Awakening at twelve midnight the plaintiff went downstairs and found his wife in the spa seated at a counter. She declined to go to bed and the plaintiff once more retired. He awoke at about 3 A.M., went downstairs, and saw his wife in the kitchen. She was leaning against the wall, and the defendant was leaning against her "so close in an amorous way with his back towards the plaintiff." Seeing the plaintiff, his wife pushed the defendant away and the latter left the room. The plaintiff rebuked his wife. The plaintiff, his wife and the defendant returned to Cambridge the next day. The following day the plaintiff told his wife that he was going to New York. His wife packed his valise and he left the house at about 9 A.M. He "hung around in the vicinity." About 1 P.M. his wife came out of the house, walked along and made a phone call, and after a time the defendant approached and embraced her in the "public" street, and they walked away and as they proceeded the defendant had his arm around the waist of the plaintiff's wife. The plaintiff followed them for a while but finally lost sight of them. His wife did not come home that afternoon or work that night. (Her working hours were from 10 P.M. to 6 A.M.) She did not return the next morning, and

late in the afternoon he saw her in the defendant's auto-
mobile, in which they drove to an eating place. Entering,
the plaintiff confronted them, called his wife a "filthy . . .".
and accused her of being unfaithful, upbraided the defend-
ant and threw a butter knife at him, challenging him. The
plaintiff's wife said, "You have a right to call me what you
called me, I have done wrong." The defendant said, "Let
us keep this thing quiet and I promise . . . [that] I will
never, never, never see your wife again." There was evi-
dence that in the meantime the plaintiff's wife and the de-
fendant had been seen in the defendant's automobile "hug-
ging one another," and that on another occasion, at about
9:30 P.M., they were making love in front of a building on
one of the streets of Lowell. In February the plaintiff
and his wife started for Florida to visit a relative of his wife.
On the journey he noticed that she was wearing a diamond
ring that he had not seen before. While in Florida he over-
heard his wife's relative asking his wife where she got that
beautiful ring, and heard his wife say, "that is nothing,
that is our engagement ring," and that "Bill Katralis, the
defendant, gave [it] to her," and also heard her say "but
wait until you see the one we have already picked out. It
is a beautiful big diamond, at ————'s in Boston, when
we get married." At the end of two weeks the plaintiff
asked his wife to go to Colorado with him, and she refused
saying that she had work to do, had other plans. He went
to Colorado alone, returned to Massachusetts, and con-
fronted the defendant, saying "Where is my wife? I want
my wife." The plaintiff's wife never returned but filed a
libel for divorce in Florida against him on the ground of
cruelty. The plaintiff did not contest the libel. He had
failed to win back her affections and did not have the money
"to go to Florida." His "house, furniture, and store were
all broken up and he has been broken up in health."

It is the contention of the defendant that the evidence
was insufficient to warrant the jury in finding for the plain-
tiff, asserting that the plaintiff had the burden of proving
infidelity on the part of his wife in which the defendant was
a participant, and that the plaintiff had failed to sustain

that burden.   This contention cannot be sustained.   The evidence would warrant the jury in finding that the defendant had been a rival for the affections of the plaintiff's wife, *Webber* v. *Benbow*, 211 Mass. 366, 368; and that the defendant by his conduct had induced her to deprive her husband of her consortium.   It was not necessary for the plaintiff to allege or prove sexual intercourse between his wife and the defendant.   It was sufficient to prove that the defendant improperly "persuaded and enticed . . . [the plaintiff's] wife to leave his home.   At common law such invasion of his rights has long been actionable."   *Gahagan* v. *Church,* 239 Mass. 558, 559, and cases cited.   The evidence of suspicious and familiar conduct on the part of the defendant toward the plaintiff's wife had a bearing on the mental attitude of the defendant and had weight "even if it tended to show adultery.   If believed, it had a tendency to throw some light upon the methods of enticement used by the defendant, and also upon . . . [his] motives.   And this is so even if adultery is not set out in the declaration."   *Webber* v. *Benbow*, 211 Mass. 366, 368.   *Bradstreet* v. *Wallace*, 254 Mass. 509, 511–512.

The evidence in the case at bar amply warranted its submission to the jury.

*Exceptions overruled.*